# SUPREME COURT OF THE UNITED STATES

ROBERT R. TOLAN *v.* JEFFREY WAYNE COTTON

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 13–551.   Decided May 5, 2014

PER CURIAM.

During the early morning hours of New Year's Eve, 2008, police sergeant Jeffrey Cotton fired three bullets at Robert Tolan; one of those bullets hit its target and punctured Tolan's right lung. At the time of the shooting, Tolan was unarmed on his parents' front porch about 15 to 20 feet away from Cotton. Tolan sued, alleging that Cotton had exercised excessive force in violation of the Fourth Amendment. The District Court granted summary judgment to Cotton, and the Fifth Circuit affirmed, reasoning that regardless of whether Cotton used excessive force, he was entitled to qualified immunity because he did not violate any clearly established right. 713 F. 3d 299 (2013). In articulating the factual context of the case, the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 255 (1986). For that reason, we vacate its decision and remand the case for further proceedings consistent with this opinion.

## I

### A

The following facts, which we view in the light most favorable to Tolan, are taken from the record evidence and the opinions below. At around 2:00 on the morning of December 31, 2008, John Edwards, a police officer, was on patrol in Bellaire, Texas, when he noticed a black Nissan

sport utility vehicle turning quickly onto a residential street. The officer watched the vehicle park on the side of the street in front of a house. Two men exited: Tolan and his cousin, Anthony Cooper.

Edwards attempted to enter the license plate number of the vehicle into a computer in his squad car. But he keyed an incorrect character; instead of entering plate number 696BGK, he entered 695BGK. That incorrect number matched a stolen vehicle of the same color and make. This match caused the squad car's computer to send an automatic message to other police units, informing them that Edwards had found a stolen vehicle.

Edwards exited his cruiser, drew his service pistol and ordered Tolan and Cooper to the ground. He accused Tolan and Cooper of having stolen the car. Cooper responded, "That's not true." Record 1295. And Tolan explained, "That's my car." *Ibid.* Tolan then complied with the officer's demand to lie face-down on the home's front porch.

As it turned out, Tolan and Cooper were at the home where Tolan lived with his parents. Hearing the commotion, Tolan's parents exited the front door in their pajamas. In an attempt to keep the misunderstanding from escalating into something more, Tolan's father instructed Cooper to lie down, and instructed Tolan and Cooper to say nothing. Tolan and Cooper then remained facedown.

Edwards told Tolan's parents that he believed Tolan and Cooper had stolen the vehicle. In response, Tolan's father identified Tolan as his son, and Tolan's mother explained that the vehicle belonged to the family and that no crime had been committed. Tolan's father explained, with his hands in the air, "[T]his is my nephew. This is my son. We live here. This is my house." *Id.*, at 2059. Tolan's mother similarly offered, "[S]ir this is a big mistake. This car is not stolen. . . . That's our car." *Id.*, at 2075.

While Tolan and Cooper continued to lie on the ground

Per Curiam

in silence, Edwards radioed for assistance. Shortly thereafter, Sergeant Jeffrey Cotton arrived on the scene and drew his pistol. Edwards told Cotton that Cooper and Tolan had exited a stolen vehicle. Tolan's mother reiterated that she and her husband owned both the car Tolan had been driving and the home where these events were unfolding. Cotton then ordered her to stand against the family's garage door. In response to Cotton's order, Tolan's mother asked, "[A]re you kidding me? We've lived her[e] 15 years. We've never had anything like this happen before." *Id.,* at 2077; see also *id.,* at 1465.

The parties disagree as to what happened next. Tolan's mother and Cooper testified during Cotton's criminal trial[1] that Cotton grabbed her arm and slammed her against the garage door with such force that she fell to the ground. *Id.,* at 2035, 2078–2080. Tolan similarly testified that Cotton pushed his mother against the garage door. *Id.,* at 2479. In addition, Tolan offered testimony from his mother and photographic evidence to demonstrate that Cotton used enough force to leave bruises on her arms and back that lasted for days. *Id.,* at 2078–2079, 2089–2091. By contrast, Cotton testified in his deposition that when he was escorting the mother to the garage, she flipped her arm up and told him to get his hands off her. *Id.,* at 1043. He also testified that he did not know whether he left bruises but believed that he had not. *Id.,* at 1044.

The parties also dispute the manner in which Tolan responded. Tolan testified in his deposition and during the criminal trial that upon seeing his mother being pushed, *id.,* at 1249, he rose to his knees, *id.,* at 1928. Edwards and Cotton testified that Tolan rose to his feet.

---

[1] The events described here led to Cotton's criminal indictment in Harris County, Texas, for aggravated assault by a public servant. 713 F. 3d 299, 303 (CA5 2013). He was acquitted. *Ibid.* The testimony of Tolan's mother during Cotton's trial is a part of the record in this civil action. Record 2066–2087.

*Id.,* at 1051–1052, 1121.

Both parties agree that Tolan then exclaimed, from roughly 15 to 20 feet away, 713 F. 3d, at 303, "[G]et your fucking hands off my mom." Record 1928. The parties also agree that Cotton then drew his pistol and fired three shots at Tolan. Tolan and his mother testified that these shots came with no verbal warning. *Id.,* at 2019, 2080. One of the bullets entered Tolan's chest, collapsing his right lung and piercing his liver. While Tolan survived, he suffered a life-altering injury that disrupted his budding professional baseball career and causes him to experience pain on a daily basis.

### B

In May 2009, Cooper, Tolan, and Tolan's parents filed this suit in the Southern District of Texas, alleging claims under Rev. Stat. §1979, 42 U. S. C. §1983. Tolan claimed, among other things, that Cotton had used excessive force against him in violation of the Fourth Amendment.[2] After discovery, Cotton moved for summary judgment, arguing that the doctrine of qualified immunity barred the suit. That doctrine immunizes government officials from damages suits unless their conduct has violated a clearly established right.

The District Court granted summary judgment to Cotton. 854 F. Supp. 2d 444 (SD Tex. 2012). It reasoned that Cotton's use of force was not unreasonable and therefore did not violate the Fourth Amendment. *Id.,* at 477–478. The Fifth Circuit affirmed, but on a different basis. 713 F. 3d 299. It declined to decide whether Cotton's actions

---

[2] The complaint also alleged that the officers' actions violated the Equal Protection Clause to the extent they were motivated by Tolan's and Cooper's race. 854 F. Supp. 2d 444, 465 (SD Tex. 2012). In addition, the complaint alleged that Cotton used excessive force against Tolan's mother. *Id.,* at 468. Those claims, which were dismissed, *id.,* at 465, 470, are not before this Court.

violated the Fourth Amendment. Instead, it held that even if Cotton's conduct did violate the Fourth Amendment, Cotton was entitled to qualified immunity because he did not violate a clearly established right. *Id.,* at 306.

In reaching this conclusion, the Fifth Circuit began by noting that at the time Cotton shot Tolan, "it was . . . clearly established that an officer had the right to use deadly force if that officer harbored an objective and reasonable belief that a suspect presented an 'immediate threat to [his] safety.'" *Id.,* at 306 (quoting *Deville* v. *Marcantel*, 567 F. 3d 156, 167 (CA5 2009)). The Court of Appeals reasoned that Tolan failed to overcome the qualified-immunity bar because "an objectively-reasonable officer in Sergeant Cotton's position could have . . . believed" that Tolan "presented an 'immediate threat to the safety of the officers.'" 713 F. 3d, at 307.[3] In support of this conclusion, the court relied on the following facts: the front porch had been "dimly-lit"; Tolan's mother had "refus[ed] orders to remain quiet and calm"; and Tolan's words had amounted to a "verba[l] threa[t]." *Ibid.* Most critically, the court also relied on the purported fact that Tolan was "moving to intervene in" Cotton's handling of his mother, *id.,* at 305, and that Cotton therefore could reasonably have feared for his life, *id.,* at 307. Accordingly, the court held, Cotton did not violate clearly established law in shooting Tolan.

The Fifth Circuit denied rehearing en banc. 538 Fed. Appx. 374 (2013). Three judges voted to grant rehearing. Judge Dennis filed a dissent, contending that the panel opinion "fail[ed] to address evidence that, when viewed in

_____

[3] Tolan argues that the Fifth Circuit incorrectly analyzed the reasonableness of Sergeant Cotton's beliefs under the second prong of the qualified-immunity analysis rather than the first. See Pet. for Cert. 12, 20. Because we rule in Tolan's favor on the narrow ground that the Fifth Circuit erred in its application of the summary judgment standard, we express no view as to Tolan's additional argument.

the light most favorable to the plaintiff, creates genuine issues of material fact as to whether an objective officer in Cotton's position could have reasonably and objectively believed that [Tolan] posed an immediate, significant threat of substantial injury to him." *Id.,* at 377.

## II
### A

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001). When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. *Graham* v. *Connor*, 490 U. S. 386, 394 (1989). The inquiry into whether this right was violated requires a balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tennessee* v. *Garner*, 471 U. S. 1, 8 (1985); see *Graham, supra*, at 396.

The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Hope* v. *Pelzer*, 536 U. S. 730, 739 (2002). Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ibid.* "[T]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.,* at 741.

Courts have discretion to decide the order in which to

engage these two prongs. *Pearson* v. *Callahan*, 555 U. S. 223, 236 (2009). But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. See *Brosseau* v. *Haugen*, 543 U. S. 194, 195, n. 2 (2004) (*per curiam*); *Saucier, supra*, at 201; *Hope, supra*, at 733, n. 1. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U. S., at 249. Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a). In making that determination, a court must view the evidence "in the light most favorable to the opposing party." *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 157 (1970); see also *Anderson, supra*, at 255.

Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard. In cases alleging unreasonable searches or seizures, we have instructed that courts should define the "clearly established" right at issue on the basis of the "specific context of the case." *Saucier, supra*, at 201; see also *Anderson* v. *Creighton*, 483 U. S. 635, 640–641 (1987). Accordingly, courts must take care not to define a case's "context" in a manner that imports genuinely disputed factual propositions. See *Brosseau, supra*, at 195, 198 (inquiring as to whether conduct violated clearly established law "'in light of the specific context of the case'" and construing "facts . . . in a light most favorable to" the nonmovant).

## B

In holding that Cotton's actions did not violate clearly established law, the Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts of this case. By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly "weigh[ed] the evidence" and resolved disputed issues in favor of the moving party, *Anderson,* 477 U. S., at 249.

First, the court relied on its view that at the time of the shooting, the Tolans' front porch was "dimly-lit." 713 F. 3d, at 307. The court appears to have drawn this assessment from Cotton's statements in a deposition that when he fired at Tolan, the porch was "'fairly dark,'" and lit by a gas lamp that was "'decorative.'" *Id.,* at 302. In his own deposition, however, Tolan's father was asked whether the gas lamp was in fact "more decorative than illuminating." Record 1552. He said that it was not. *Ibid.* Moreover, Tolan stated in his deposition that two floodlights shone on the driveway during the incident, *id.,* at 2496, and Cotton acknowledged that there were two motion-activated lights in front of the house. *Id.,* at 1034. And Tolan confirmed that at the time of the shooting, he was "not in darkness." *Id.,* at 2498–2499.

Second, the Fifth Circuit stated that Tolan's mother "refus[ed] orders to remain quiet and calm," thereby "compound[ing]" Cotton's belief that Tolan "presented an immediate threat to the safety of the officers." 713 F. 3d, at 307 (internal quotation marks omitted). But here, too, the court did not credit directly contradictory evidence. Although the parties agree that Tolan's mother repeatedly informed officers that Tolan was her son, that she lived in the home in front of which he had parked, and that the vehicle he had been driving belonged to her and her husband, there is a dispute as to how calmly she provided this information. Cotton stated during his deposition that

Tolan's mother was "very agitated" when she spoke to the officers. Record 1032–1033. By contrast, Tolan's mother testified at Cotton's criminal trial that she was neither "aggravated" nor "agitated." *Id.,* at 2075, 2077.

Third, the Court concluded that Tolan was "shouting," 713 F. 3d, at 306, 308, and "verbally threatening" the officer, *id.,* at 307, in the moments before the shooting. The court noted, and the parties agree, that while Cotton was grabbing the arm of his mother, Tolan told Cotton, "[G]et your fucking hands off my mom." Record 1928. But Tolan testified that he "was not screaming." *Id.,* at 2544. And a jury could reasonably infer that his words, in context, did not amount to a statement of intent to inflict harm. Cf. *United States* v. *White*, 258 F. 3d 374, 383 (CA5 2001) ("A threat imports '[a] communicated intent to inflict physical or other harm'" (quoting Black's Law Dictionary 1480 (6th ed. 1990))); *Morris* v. *Noe*, 672 F. 3d 1185, 1196 (CA10 2012) (inferring that the words "Why was you talking to Mama that way" did not constitute an "overt threa[t]"). Tolan's mother testified in Cotton's criminal trial that he slammed her against a garage door with enough force to cause bruising that lasted for days. Record 2078–2079. A jury could well have concluded that a reasonable officer would have heard Tolan's words not as a threat, but as a son's plea not to continue any assault of his mother.

Fourth, the Fifth Circuit inferred that at the time of the shooting, Tolan was "moving to intervene in Sergeant Cotton's" interaction with his mother. 713 F. 3d, at 305; see also *id.,* at 308 (characterizing Tolan's behavior as "abruptly attempting to approach Sergeant Cotton," thereby "inflam[ing] an already tense situation"). The court appears to have credited Edwards' account that at the time of the shooting, Tolan was on both feet "[i]n a crouch" or a "charging position" looking as if he was going to move forward. Record 1121–1122. Tolan testified at

trial, however, that he was on his knees when Cotton shot
him, *id.,* at 1928, a fact corroborated by his mother, *id.,* at
2081. Tolan also testified in his deposition that he "wasn't
going anywhere," *id.,* at 2502, and emphasized that he did
not "jump up," *id.,* at 2544.

Considered together, these facts lead to the inescapable
conclusion that the court below credited the evidence of
the party seeking summary judgment and failed properly
to acknowledge key evidence offered by the party opposing
that motion. And while "this Court is not equipped to
correct every perceived error coming from the lower federal
courts," *Boag* v. *MacDougall* 454 U. S. 364, 366 (1982)
(O'Connor, J., concurring), we intervene here because the
opinion below reflects a clear misapprehension of sum-
mary judgment standards in light of our precedents. Cf.
*Brosseau*, 543 U. S., at 197–198 (summarily reversing
decision in a Fourth Amendment excessive force case "to
correct a clear misapprehension of the qualified immunity
standard"); see also *Florida Dept. of Health and Rehabili-
tative Servs.* v. *Florida Nursing Home Assn.*, 450 U. S.
147, 150 (1981) (*per curiam*) (summarily reversing an
opinion that could not "be reconciled with the principles
set out" in this Court's sovereign immunity jurisprudence).

The witnesses on both sides come to this case with their
own perceptions, recollections, and even potential biases.
It is in part for that reason that genuine disputes are
generally resolved by juries in our adversarial system. By
weighing the evidence and reaching factual inferences
contrary to Tolan's competent evidence, the court below
neglected to adhere to the fundamental principle that at
the summary judgment stage, reasonable inferences
should be drawn in favor of the nonmoving party.

Applying that principle here, the court should have
acknowledged and credited Tolan's evidence with regard
to the lighting, his mother's demeanor, whether he shouted
words that were an overt threat, and his positioning

Per Curiam

during the shooting. This is not to say, of course, that these are the only facts that the Fifth Circuit should consider, or that no other facts might contribute to the reasonableness of the officer's actions as a matter of law. Nor do we express a view as to whether Cotton's actions violated clearly established law. We instead vacate the Fifth Circuit's judgment so that the court can determine whether, when Tolan's evidence is properly credited and factual inferences are reasonably drawn in his favor, Cotton's actions violated clearly established law.

\*    \*    \*

The petition for certiorari and the NAACP Legal Defense and Educational Fund's motion to file an *amicus curiae* brief are granted. The judgment of the United States Court of Appeals for the Fifth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

ROBERT R. TOLAN *v.* JEFFREY WAYNE COTTON

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 13–551.　Decided May 5, 2014

JUSTICE ALITO, with whom JUSTICE SCALIA joins, concurring in the judgment.

The Court takes two actions. It grants the petition for a writ of certiorari, and it summarily vacates the judgment of the Court of Appeals.

The granting of a petition for plenary review is not a decision from which Members of this Court have customarily registered dissents, and I do not do so here. I note, however, that the granting of review in this case sets a precedent that, if followed in other cases, will very substantially alter the Court's practice. See, *e.g.,* this Court's Rule 10 ("A petition for a writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law"); S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice §5.12(c)(3), p. 352 (10th ed. 2013) ("[E]rror correction . . . is outside the mainstream of the Court's functions and . . . not among the 'compelling reasons' . . . that govern the grant of certiorari").

In my experience, a substantial percentage of the civil appeals heard each year by the courts of appeals present the question whether the evidence in the summary judgment record is just enough or not quite enough to support a grant of summary judgment. The present case falls into that very large category. There is no confusion in the courts of appeals about the standard to be applied in ruling on a summary judgment motion, and the Court of Appeals invoked the correct standard here. See 713 F. 3d

299, 304 (CA5 2013). Thus, the only issue is whether the relevant evidence, viewed in the light most favorable to the nonmoving party, is sufficient to support a judgment for that party. In the courts of appeals, cases presenting this question are utterly routine. There is no question that this case is important for the parties, but the same is true for a great many other cases that fall into the same category.

On the merits of the case, while I do not necessarily agree in all respects with the Court's characterization of the evidence, I agree that there are genuine issues of material fact and that this is a case in which summary judgment should not have been granted.

I therefore concur in the judgment.