# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 19, 2014

No. 13-10899

Lyle W. Cayce
Clerk

BEATRICE LUNA, Individually and as Representative of the Estate of Israel
Leija, Jr.; CHRISTINA MARIE FLORES, as Next Friend of J.L. and J.L.,
Minor Children,

Plaintiffs - Appellees

v.

CHADRIN LEE MULLENIX, In His Individual Capacity,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before HAYNES and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

We withdraw our prior opinion of August 28, 2014, *Luna v. Mullenix*, 765
F.3d 531 (5th Cir. 2014), and substitute the following.[1]

This § 1983 excessive use of force case arises from the shooting and death
of Israel Leija, Jr. by Texas Department of Public Safety (DPS) Trooper
Chadrin Mullenix during a high-speed pursuit. The district court denied
Mullenix's motion for summary judgment on the issue of qualified immunity,
holding that multiple genuine disputes of material fact existed as to the

---

[1] Judge King, a member of the original panel in this case, did not participate in the
consideration of this opinion. This matter is decided by a quorum. 28 U.S.C. § 46(d).

No. 13-10899

qualified immunity analysis. Because we conclude that Mullenix is not entitled to summary judgment on qualified immunity, we affirm.

## I. Factual and Procedural Background

On March 23, 2010, at approximately 10:21 p.m., Sergeant Randy Baker of the Tulia Police Department followed Israel Leija, Jr. to a Sonic Drive-In to arrest him on a motion to revoke misdemeanor probation. The arrest warrant had been filed because (1) Leija had failed to complete all of his hours of community service, and (2) a new complaint of domestic violence had been filed against Leija, who was on probation. After some discussion with Baker, Leija fled the scene and headed north towards Interstate Highway 27 ("I-27"), with Baker in pursuit. Texas DPS Trooper Gabriel Rodriguez was on patrol nearby and took the lead in the pursuit. Around mile marker 77, Leija entered I-27 and continued north, with Rodriguez directly behind him. During the approximately 18 minutes that the pursuit lasted, Rodriguez followed Leija and captured the pursuit on his video recorder. The video supports the plaintiffs' assertions that although the pursuit proceeded north on 1-27 at speeds between 85 and 110 miles per hour, traffic on the dry roadway was light; Leija remained on the paved portion of the road with his headlights on, did not run any vehicles off the road, did not collide with any vehicles, and did not cause any collisions; there were no pedestrians or stopped vehicles along the road; and all of the pursuit occurred in rural areas, without businesses or residences near the interstate, which was divided by a wide center median.

As the pursuit headed north on I-27, other law enforcement units joined. Officer Troy Ducheneaux of the Canyon Police Department deployed tire spikes underneath the overpass at Cemetery Road and I-27. DPS Troopers set up spikes at McCormick Road, north of Cemetery Road. Other police units set up spikes at an additional location further north, for a total of three spike locations ahead of the pursuit. The record reflects that officers had received

2

training on the deployment of spikes, and had been trained to take a protective position while deploying spikes, if possible, so as to minimize the risk posed by the passing driver.

During the pursuit, Leija twice called the Tulia Police Dispatch on his cell phone, claiming that he had a gun, and that he would shoot at police officers if they did not cease the pursuit. This information was relayed to all officers involved. It was discovered later that Leija had no weapon in his possession.

DPS Trooper Chadrin Mullenix was on patrol thirty miles north of the pursuit, and also responded. Mullenix went to the Cemetery Road overpass, initially intending to set up spikes at that location, but ultimately decided to attempt to disable the car by shooting it. He positioned his vehicle atop the Cemetery Road bridge, twenty feet above I-27, intending to shoot at the vehicle as it approached. Mullenix planned to use his .223 caliber M-4 rifle to disable the vehicle by shooting at its engine block, although he had never attempted that before and had never seen it done before. The district court noted that "[t]here is no evidence—one way or another—that any attempt to shoot out an engine block moving at 80 mph could possibly have been successful." Mullenix testified that he had been trained in shooting upwards at moving objects, specifically clay pigeons, with a shotgun. He had no training on how to shoot at a moving vehicle to disable it.

Mullenix's dash cam video reflects that once he got to the Cemetery Road overpass, he waited for about three minutes for the pursuit to arrive. Mullenix relayed to Officer Rodriguez that he was thinking about setting up with a rifle on the bridge. Rodriguez replied "10-4," told Mullenix where the pursuit was, and that Leija had slowed down to 85 miles per hour. Mullenix then asked the Amarillo DPS dispatch to contact DPS Sergeant Byrd, Mullenix's supervisor, to tell Byrd that he was thinking about shooting the car and to ask whether

the sergeant thought that was "worth doing." According to plaintiffs' allegations, he contacted Byrd to "request permission" to fire at the vehicle. Mullenix denies that he requested or needed "permission," but stated that he "asked for what [Byrd] advised" and asked to "get his advice." Mullenix did not wait for a response from Sergeant Byrd, but exited his patrol vehicle, took out his rifle, and took a shooting position on the bridge. During this time, the dispatcher relayed a response from Sergeant Byrd to "stand by" and "see if the spikes work first." Mullenix alleges that he was unable to hear that instruction because he had failed to turn on his outside loudspeakers, thereby placing himself out of communication with his dispatch or other officers involved in the pursuit. Plaintiffs allege that since the trunk was open, Mullenix should have heard the response. Mullenix did have his radio microphone on him. During the waiting minutes, Mullenix had a short, casual conversation with Randall County Sheriff's Deputy Tom Shipman about whether he could shoot the vehicle to disable it. When Shipman mentioned to Mullenix that there was another officer beneath the overpass, Mullenix replied that he did not think he would hit that officer.

As the two vehicles approached, Mullenix fired six rounds at Leija's car. There were no streetlights or ambient lighting. It was dark. Mullenix admitted he could not discern the number of people in Leija's vehicle, whether there were passengers, or what anyone in the car was doing. Mullenix testified that at the time of the shooting, he was not sure who was below the overpass, whether Ducheneaux had actually set up spikes there, or where Ducheneaux was positioned beneath the overpass. After Mullenix fired, Leija's car continued north, engaged the spike strip, hit the median and rolled two and a half times. In the aftermath of the shooting, Mullenix remarked to his supervisor, Sergeant Byrd, "How's that for proactive?" Mullenix had been in a

counseling session earlier that same day, during which Byrd intimated that Mullenix was not being proactive enough as a Trooper.

Leija was pronounced dead soon after the shooting. The cause of death was later determined to be one of the shots fired by Mullenix that had struck Leija in the neck. The evidence indicates that at least four of Mullenix's six shots struck Leija's upper body, and no evidence indicates that Mullenix hit the vehicle's radiator, hood or engine block.

The incident was investigated by Texas Ranger Jay Foster. Foster concluded that Mullenix complied with DPS policy and Texas law. The DPS Firearms Discharge Review board reviewed the shooting and concluded that Mullenix complied with DPS policy and Texas law. A grand jury declined to return an indictment of Mullenix. A DPS Office of the Inspector General ("OIG") Report concluded the opposite, that Mullenix was not justified and acted recklessly. The parties disputed the relevance and admissibility of that OIG report, which was subsequently called into question by its author, who testified that he did not have full information on the incident or investigation when he wrote the report. The district court mentioned the report in its statement of facts, but did not further discuss the report.

Beatrice Luna, as the representative of Leija's estate, and Christina Flores, on behalf of Leija's minor child, sued DPS, the Director of DPS Steve McCraw, Trooper Rodriguez, and Trooper Mullenix, in state court, asserting claims under the Texas Tort Claims Act and 42 U.S.C. § 1983. Defendants removed to federal court. Director McCraw's Motion to Dismiss was granted, and plaintiffs' stipulation of dismissal against DPS and Trooper Rodriguez was granted with prejudice. The sole remaining claim is the § 1983 claim against Mullenix, alleging that he subjected Leija to an unconstitutional use of excessive force in violation of the Fourth Amendment. Mullenix answered and asserted the defense of qualified immunity. After discovery, Mullenix moved

No. 13-10899

for summary judgment on the issue of qualified immunity.  On August 7, 2013, the district court issued a memorandum opinion and order denying Mullenix's motion for summary judgment.  Mullenix appeals.

## II.  Discussion

The doctrine of qualified immunity shields "government officials performing discretionary functions. . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In reviewing a motion for summary judgment based on qualified immunity, we undertake a two-step analysis.  First, we ask whether the facts, taken in the light most favorable to the plaintiffs, show the officer's conduct violated a federal constitutional or statutory right.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014); *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Second, we ask "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores*, 381 F.3d at 395 (internal quotation marks omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see Tolan,* 134 S. Ct. at 1866.  We may examine these two factors in any order.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling in part *Saucier v. Katz*, 553 U.S. 194 (2001)).  Claims of qualified immunity must be evaluated in the light of what the officer knew at the time he acted, not on facts discovered subsequently.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989); *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 411 (5th Cir. 2009).  As the Supreme Court has recently reaffirmed, "in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 134 S. Ct. at 1863 (internal quotation marks and alteration omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Our jurisdiction to review a denial of a motion for summary judgment based on qualified immunity is limited to legal questions. *See, e.g., Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc). Because of this jurisdictional limitation, "we consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Id.* at 348; *see Flores*, 381 F.3d at 394. We review the objective reasonableness of the defendant government official's actions and the scope of clearly established law de novo. *See Flores*, 381 F.3d at 394. We "may review the district court's conclusion that issues of fact are material, but not the conclusion that those issues of fact are genuine." *Id.*

### A.     Constitutional Violation

Under the first prong of the qualified immunity analysis, the plaintiffs must produce facts sufficient to show that Mullenix's actions violated Leija's Fourth Amendment rights. *Tolan*, 134 S. Ct. at 1865; *Flores*, 381 F.3d at 395. "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). To show a violation, the plaintiffs must produce facts sufficient to show that Leija suffered (1) an injury; (2) which resulted directly from a use of force that was clearly excessive to the need; and (3) the force used was objectively unreasonable. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000). "This is an objective standard: 'the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Ramirez v. Knoulton*, 542 F.3d 124, 128-29 (5th Cir. 2008) (quoting *Graham*, 490 U.S. at 396).

"There are few, if any, bright lines for judging a police officer's use of force; when determining whether an officer's conduct violated the Fourth

Amendment, we must slosh our way through the factbound morass of reasonableness." *Lytle*, 560 F.3d at 411 (internal quotation marks and alteration omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). "To gauge the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for force," paying "careful attention to the facts and circumstances of each particular case." *Flores*, 381 F.3d at 399. "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9; *see Flores*, 381 F.3d at 399. Balanced against this intrusion are "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Lytle*, 560 F.3d at 411.

When deadly force is used, it is clear that the severity and immediacy of the threat of harm to officers or others are paramount to the reasonableness analysis. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2021 (2014) (concluding that deadly force was not objectively unreasonable where "it is beyond serious dispute that Rickard's flight posed a grave public safety risk"); *Scott*, 550 U.S. at 386 (noting that the use of deadly force was not objectively unreasonable when "[t]he car chase that respondent initiated in this case posed a substantial and immediate risk of serious physical injury to others"); *see also Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer . . . the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."); *Thompson v. Mercer*, 762 F.3d 433, 440 (5th Cir. 2014) (noting that "the question is whether the officer had reason to believe, at that moment, that there was a threat of physical harm"); *Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007) (noting that the "reasonableness of an officer's use of deadly force is. . . determined by the existence of a credible, serious threat to the

physical safety of the officer or to those in the vicinity"); *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001) ("The excessive force inquiry is confined to whether the Trooper was in danger at the moment of the threat that resulted in the Trooper's shooting Bazan."); *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003) ("Genuine issues of material fact remain as to whether [the suspects'] flight presented an immediate threat of serious harm to [the police officer] or others at the time [the officer] fired the shot.").

With regard to high-speed chases, the Supreme Court has held that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Scott*, 550 U.S. at 386; *see also Plumhoff*, 134 S. Ct. at 2021-22 (applying *Scott* to a case involving the shooting of a suspect in a high-speed chase). Likewise, this court has recently held that a sheriff who used an assault rifle to intentionally shoot a fleeing suspect as he approached in a truck, after a lengthy, dangerous chase, did not violate the Fourth Amendment. *Thompson*, 762 F.3d at 438. These cases, however, do not establish a bright-line rule; "a suspect that is fleeing in a motor vehicle is not so inherently dangerous that an officer's use of deadly force is *per se* reasonable." *Lytle*, 560 F.3d at 416. Instead, *Scott*, *Plumhoff* and *Thompson* are simply applications of the Fourth Amendment's reasonableness requirement to particular facts. *See Plumhoff*, 134 S. Ct. at 2020-22; *Scott*, 550 U.S. at 382-83; *Thompson*, 762 F.3d at 438. "Nearly any suspect fleeing in a motor vehicle poses some threat of harm to the public. As the cases addressing this all-too-common scenario evince, the real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable." *Lytle*, 560 F.3d at 415; *see Thompson*, 762 F.3d at 438.

No. 13-10899

Mullenix asserts that, as a matter of law, his use of force was not objectively unreasonable because he acted to protect other officers, including Officer Ducheneaux beneath the overpass and officers located further north up the road, as well as any motorists who might have been located further north. However, accepting plaintiffs' version of the facts (and reasonable inferences therefrom) as true, these facts are sufficient to establish that Mullenix's use of deadly force was objectively unreasonable. *See Newman v. Guedry*, 703 F.3d 757, 762 (5th Cir. 2012) ("Mindful that we are to view the facts in a light most favorable to Newman, and seeing nothing in the three video recordings to discredit his allegations, we conclude, based only on the evidence in the summary-judgment record, that the use of force was objectively unreasonable in these circumstances."); *Haggerty v. Tex. State. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004) ("In an interlocutory appeal in which the defendant asserts qualified immunity, to the extent that the district court found that genuine factual disputes exist, we accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true."); *see also Tolan*, 134 S. Ct. at 1863 ("[I]n ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Many of the facts surrounding Leija's flight from police, viewed in the light most favorable to the plaintiffs, negate the risk factors central to the reasonableness findings in cases like *Scott*, *Plumhoff* and *Thompson*. According to the plaintiffs' version of the facts, although Leija was clearly speeding excessively at some times during the pursuit, traffic on the interstate in the rural area was light. There were no pedestrians, no businesses and no residences along the highway, and Leija ran no other cars off the road and engaged no police vehicles. Further, there is evidence showing that Leija had slowed to 85 miles per hour prior to the shooting. Spike systems, which could

have ended the pursuit without resort to deadly force, had already been prepared in three locations ahead of the pursuit.  In *Scott* and *Plumhoff*, on the other hand, multiple other methods of stopping the suspect through alternate means had failed, the suspects were traveling on busy roads, had forced multiple other drivers off the road, had caused collisions with officers or innocent bystanders, and at the time of the shooting were indisputably posing an immediate threat to bystanders or other officers in the vicinity.  *See Plumhoff*, 134 S. Ct. at 2017-18, 2021-22; *Scott*, 550 U.S. at 379-80, 383-84.  Likewise, in *Thompson*, this court found that the officers had tried "four times" to stop the chase with "alternate means of seizure before resorting to deadly force" to stop a driver who posed "extreme danger to human life."  *Thompson*, 762 F.3d at 438, 440.  The *Thompson* court explained that

> even the Thompsons concede that their son represented a grave risk when he "reached speeds exceeding 100 miles per hour on the interstate, when he ran numerous stop signs, when he had 'recklessly' driven on the wrong side of the road, [and] when he avoided some road spikes [and] took officers down Blue Flat Road where a horse was loose." Indeed, parts of the police camera footage might be mistaken for a video game reel, with Keith disregarding every traffic law, passing other motorists on the left, on the right, on the shoulder, and on the median. He occasionally drove off the road altogether and used other abrupt maneuvers to try to lose his pursuers.  The truck was airborne at least twice, with Keith struggling to regain control of the vehicle.  In short, Keith showed a shocking disregard for the welfare of passersby and of the pursuing law enforcement officers.

*Id.* at 438.

To the extent that we must view facts in accordance with the video, *see Scott*, 550 U.S. at 378-80; *Thompson*, 762 F.3d at 439, the video supports the plaintiffs' version of the facts.  In *Scott*, the plaintiff argued that the force used was unreasonable because the driver posed "little, if any actual threat to

No. 13-10899

pedestrians or other motorists." *Scott*, 550 U.S. at 378. However, the Court said,

> [t]he videotape tells quite a different story. There we see respondent's vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit. We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up. Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.

*Id.* at 379-80. The Court relied on the video to resolve disputed facts, holding that the video "blatantly contradicted" the plaintiff's version of the facts, "so that no reasonable jury could believe it." *Id.* at 380. Likewise, in *Thompson*, the plaintiffs argued that the threat posed by the chase had ended because the rural road was empty by the time of the shooting, but this court found that "the Thompsons' characterization of the scene is belied by the video evidence," which showed multiple cars pulling over to avoid the chase, and dangerous conditions on the road, which had limited visibility and no shoulder for cars to pull onto. *Thompson*, 762 F.3d at 439. Here, however, the video supports the plaintiffs' assertions that during the pursuit, traffic on the divided highway was light, there were no pedestrians, businesses or residences along the highway, and Leija ran no other cars off the road and did not engage any police vehicles.

Further, in concluding that the use of force was not objectively unreasonable, the *Thompson* opinion relies repeatedly on the fact that the officers had made four attempts to disable the vehicle with "alternate means of seizure before resorting to deadly force." *Thompson*, 762 F.3d at 438, 440.

No. 13-10899

With regard to the existence of a Fourth Amendment violation, the holding of *Thompson* is that "after multiple other attempts to disable the vehicle failed, it was not unreasonable for Mercer to turn to deadly force to terminate the dangerous high-speed chase." *Id.* at 438. The opinion later similarly concludes that "law enforcement reasonably attempted alternate means of seizure before resorting to deadly force," *id.* at 440, and discusses this fact twice in its discussion of whether the law was sufficiently clearly established, *id.* at 440-41. In the instant case, there were spikes already in place under the bridge, and officers prepared to deploy spikes in two additional locations up the road. Yet Mullenix fired his rifle at Leija's vehicle before Leija had encountered any of the spikes. In contrast to *Thompson*, the alternative methods of seizure that were already prepared were never given a chance to work before Mullenix resorted to deadly force.

We certainly do not discount Leija's threats to shoot officers, which he made to the Tulia dispatcher and which were relayed to Mullenix and other officers. However, allegedly being armed and in a car fleeing are not, by themselves, sufficient to establish that Leija posed such an imminent risk of harm that deadly force was permitted. In a case involving the shooting of a suspect, we have stated that the "core issue" is "whether the officer reasonably perceived an immediate threat." *Reyes v. Bridgwater*, 362 F. App'x 403, 408 (5th Cir. 2010). "[T]he focus of the inquiry is the act that led the officer to discharge his weapon." *Id.* at 406 (internal quotation marks and alteration omitted) (quoting *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009)); *see also Bazan*, 246 F.3d at 493 ("The excessive force inquiry is confined to whether the Trooper was in danger at the moment of the threat that resulted in the Trooper's shooting."). The factual scenario here is substantially different, in terms of the imminence and immediacy of the risk of harm, from situations where we have granted qualified immunity to officers who shot an armed

13

suspect, or a suspect believed to be armed. *See Ramirez*, 542 F.3d at 127, 129 (suspect stopped by the side of the road after a brief chase displayed a gun, repeatedly ignored police commands, was located yards from police officers, and brought his hands together in a manner that indicated he may have been reaching for the gun, prompting officer to shoot him); *Ballard v. Burton*, 444 F.3d 391, 402-03 (5th Cir. 2006) (mentally disturbed suspect "refused to put down his rifle, discharged the rifle into the air several times while near officers, and pointed it in the general direction of law enforcement officers"); *Reese v. Anderson*, 926 F.2d 494, 500-01 (5th Cir. 1991) (suspect stopped after a high-speed chase refused to exit the car, refused to follow police commands, repeatedly raised and lowered his hands, turned away from the officer and reached lower toward the floorboard, prompting the officer to shoot him); *compare Reyes*, 362 F. App'x at 407 (fact issue precluded qualified immunity where suspect was armed with a knife, but made no threatening gesture or motion), *with Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (qualified immunity granted to officer where video confirmed that suspect "was standing up out of bed and had raised the knife above his head at the time the shots were fired"). We discuss these cases not because we hold that an officer must actually see a weapon before taking action to protect himself or others from the suspect, but because they illustrate that, even when a weapon is present, the threat must be sufficiently imminent at the moment of the shooting to justify deadly force.

In *Thompson*, the court did note the existence of a stolen gun in the car of the fleeing suspect as a fact that supported its conclusion that the suspect posed an "ongoing threat of serious harm," even though the officer had no way of ascertaining whether the suspect intended to use the weapon. *Thompson*, 762 F.3d at 439 (quotation omitted). However, in *Thompson*, the officer also knew at the time of the shooting that the suspect was fleeing in a stolen car

with a stolen weapon, had abducted a woman during his flight, and that the "unidentified suspect was admittedly suicidal and had already acted with utter desperation in attempting to evade law enforcement." *Id.* Thus, the court found that the officer was "justified in assuming" that the presence of the stolen weapon contributed to the continuing threat posed by suspect. *Id.*

Here, although Leija had stated to the dispatcher that he was armed and would shoot officers, he was not fleeing the scene of a violent crime, no weapon was ever seen, and at the time of the shooting, most officers and bystanders were miles away, where they would not have been encountered until after the spikes were given a chance to stop the chase. On appeal, Mullenix relies heavily on the presence of Ducheneaux beneath the overpass, and the risk that Leija could shoot Ducheneaux as he sped by. However, he also testified that he did not actually know Ducheneaux's position or what he was doing beneath the overpass.[2] Mullenix argues that he knew that an officer had to be positioned near a roadway to deploy spikes, but the facts, taken in the light most favorable to the plaintiffs, also show that officers were trained to deploy spikes in a location where they were able to take a protective position, that there were several pillars at the Cemetery Road overpass and that Ducheneaux had positioned himself behind a pillar as he was trained to do. Further, just prior to the shooting, Sheriff's Deputy Shipman mentioned Ducheneaux's presence beneath the overpass, and Mullenix replied only that he did not think *he* would hit Mullenix; he did not indicate that he perceived a threat to Ducheneaux from Leija. In this situation, the facts, viewed in the

---

[2] We do not hold that an officer must necessarily have another officer that he believes to be in danger in his sightline at the time he takes action. We merely state that the facts, viewed in favor of the plaintiffs, are sufficient to show that Mullenix—positioned atop a bridge in the dark of night, and eventually out of contact with other officers—lacked sufficient knowledge to determine whether or not Ducheneaux was in immediate danger from Leija, or whether Mullenix's own actions were decreasing the risk to Ducheneaux.

light most favorable to the plaintiffs, do not establish that Mullenix reasonably perceived an immediate threat at the time of the shooting, sufficient to justify the use of deadly force.

The plaintiffs also point to evidence in the record showing that Mullenix heard the warning that Leija had said he had a gun six minutes before the shooting, and went to the bridge and waited three minutes for Leija's car to approach. During this period Mullenix had time to consider his approach, including time to ask for his supervisor's opinion, inform Rodriguez of his intentions, and discuss the feasibility of shooting the car with Shipman. This is not the type of "split-second judgment" that officers must make when faced with an imminent risk of harm to themselves or others. *See Plumhoff*, 134 S. Ct. at 2020; *Graham*, 490 U.S. at 396-97; *Hathaway*, 507 F.3d at 320-21. Although Mullenix relies heavily on the assertion that it is up to the "officer on the scene" to make judgments about the use of deadly force, Mullenix was not the only, or even the primary, officer on the scene. Officer Rodriguez was immediately in pursuit of Leija, and multiple other officers from various law enforcement agencies were on the scene at Cemetery Road and were at multiple locations further north along I-27, planning to deploy tire spikes to stop the suspect. There is no evidence that any other officer from any of the law enforcement agencies involved in the pursuit, hearing the same information that Mullenix heard, including the information regarding Leija's threats, decided that deadly force was necessary or warranted. Further, via the dispatcher, Mullenix asked his supervisor, Sergeant Byrd, about his plan to shoot at the car. It is undisputed that Sergeant Byrd advised Mullenix to "stand by" and "see if the spikes work first." While Mullenix contends he did not hear his supervisor's command to stand by, plaintiffs proffered evidence that he could have heard that command. If plaintiffs' evidence is taken as true, it supports the conclusion that Mullenix acted objectively unreasonably.

No. 13-10899

Lastly, Mullenix testified that he intended to shoot the engine block of the car in an attempt to disable it, although there is no evidence that shooting at the engine is a feasible method of immediately disabling a car. His justification for the use of force was to disable the car, but alternative methods were already in place to achieve the same goal, undermining the asserted necessity for resorting to deadly force at that particular instant.

We conclude that the plaintiffs have produced facts that, viewed in their favor and supported by the record, establish that Mullenix's use of force at the time of the shooting was objectively unreasonable under the Fourth Amendment.

### B.    Clearly Established Law

Under the second prong of the qualified immunity analysis, plaintiffs must show that Mullenix's actions violated a constitutional right that was sufficiently clearly established. *Flores*, 381 F.3d at 395. For a right to be clearly established, "[t]he contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "The central concept [of the test] is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney*, 367 F.3d at 350 (quoting *Hope*, 536 U.S. at 740). Further, while the Supreme Court has stated that "courts should define the 'clearly established' right at issue on the basis of the 'specific context of the case,'" it has also recently reminded us that we "must take care not to define a case's 'context' in a manner that imports

17

genuinely disputed factual propositions." *Tolan*, 134 S. Ct. at 1866 (quoting *Saucier*, 533 U.S. at 201).

While Mullenix devotes the bulk of his argument to this prong of the qualified immunity analysis, "We need not dwell on this issue. It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Lytle*, 560 F.3d at 417. "This holds as both a general matter and in the more specific context of shooting a suspect fleeing in a motor vehicle." *Id*. at 417-18 (internal citations omitted) (citing *Kirby v. Duva*, 530 F.3d 475, 484 (6th Cir. 2008); *Vaughan,* 343 F.3d at 1332-33); *see also Sanchez v. Fraley*, 376 F. App'x 449, 452-53 (5th Cir. 2010) (holding that "it was clearly established well before [April 23, 2007] that deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," and "the threat of serious harm must be immediate"); *Reyes*, 362 F. App'x at 406 ("Unlike some areas of constitutional law, the question of when deadly force is appropriate—and the concomitant conclusion that deadly force is or is not excessive—is well-established.").

Mullenix points to the Supreme Court's recent decision in *Plumhoff* to argue that the law was not clearly established. The *Plumhoff* Court relied primarily on *Brosseau*, which held that as of 1999 it was not clearly established that it was objectively unreasonable force "to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Brosseau,* 543 U.S. at 195-97, 200. However, *Plumhoff* holds only that where a fleeing suspect "indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby," a police officer's use of deadly force is not clearly established as unreasonable.

*Plumhoff*, 134 S. Ct at 2021-22, 2023; *see Brosseau*, 543 U.S. at 200. It does not, however, undermine the clearly established law that an officer may not use deadly force against a fleeing suspect absent a sufficient risk to officers or bystanders. *See Lytle*, 560 F.3d at 417-18. *Thompson* is no different. Similar to *Plumhoff*, it holds that the officer's use of force to stop a high-speed chase was not clearly established as unreasonable where the fleeing suspect had stolen a car and kidnapped a woman, had evaded four attempts to stop the car with alternate methods of seizure, and whose driving continued to pose a "tremendous risk" to the public and other officers. *Thompson*, 762 F.3d at 440-41.

At the time of this incident, the law was clearly established such that a reasonable officer would have known that the use of deadly force, absent a sufficiently substantial and immediate threat, violated the Fourth Amendment.[3]

### III. Conclusion

For the foregoing reasons, we AFFIRM the denial of summary judgment.

---

[3] Mullenix makes a separate argument that the district court relied on inadmissible summary judgment evidence, specifically the OIG report concluding that Mullenix's actions were not justified. This report was later called into question by its author, who testified that it was not based on a full review of the incident. However, there is no indication in the district court's order that it relied on the OIG report in denying summary judgment, and we likewise do not rely on it. If there are questions as to its admissibility, the district court can resolve those in due course as the litigation proceeds.