Justice SOTOMAYOR, dissenting.
Chadrin Mullenix fired six rounds in the dark at a car traveling 85 miles per hour. He did so without any training in that tactic, against the wait order of his superior officer, and less than a second before the car hit spike strips deployed to stop it. Mullenix's rogue conduct killed the driver, Israel Leija, Jr. Because it was clearly established under the Fourth Amendment that an officer in Mullenix's position should not have fired the shots, I respectfully dissent from the grant of summary reversal.
I
Resolving all factual disputes in favor of plaintiffs, as the Court must on a motion for summary judgment, Mullenix knew the following facts before he shot at Leija's engine block: Leija had led police officers on an 18-minute car chase, at speeds ranging from 85 to 110 miles per hour. 773 F.3d 712, 716 (C.A.5 2014). Leija had twice called the police dispatcher threatening to shoot at officers if they did not cease the pursuit. Ibid. Police officers were deploying three sets of spike strips in order to stop Leija's flight. Ibid. The officers were trained to stop a car using spike strips. This training included how to take a defensive position to minimize the risk of danger from the target car. Ibid. Mullenix knew that spike strips were being set up directly beneath the overpass where he was stationed. Id., at 723. There is no evidence below that any of the officers with whom Mullenix was in communication-including Officer Troy Ducheneaux, whom Mullenix believed to be below the overpass-had expressed any concern for their safety. Id., at 720.
Mullenix had no training in shooting to disable a moving vehicle and had never seen the tactic done before. Id., at 716. He also lacked permission to take the shots: When Mullenix relayed his plan to his superior officer, Robert Byrd, Byrd responded "stand by" and "see if the spikes work first." Id., at 716-717. Three minutes after arriving at the overpass, Mullenix fired six rounds at Leija's car. None hit the car's engine block; at least four struck Leija in the upper body, killing Leija. Id., at 717.
II
When confronting a claim of qualified immunity, a court asks two questions. First, the court considers whether the officer *314 in fact violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, the court asks whether the contours of the right were "sufficiently clear that a reasonable official would [have understood] that what he is doing violates that right." Id., at 202, 121 S.Ct. 2151 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ). This Court has rejected the idea that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." Id ., at 640, 107 S.Ct. 3034. Instead, the crux of the qualified immunity test is whether officers have "fair notice" that they are acting unconstitutionally. Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).
Respondents here allege that Mullenix violated the Fourth Amendment's prohibition on unreasonable seizures by using deadly force to apprehend Leija. This Court's precedents clearly establish that the Fourth Amendment is violated unless the " 'governmental interests' " in effectuating a particular kind of seizure outweigh the " 'nature and quality of the intrusion on the individual's Fourth Amendment interests.' " Scott v. Harris, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ). There must be a "governmental interes[t]" not only in effectuating a seizure, but also in "how [the seizure] is carried out." Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).
Balancing a particular governmental interest in the use of deadly force against the intrusion occasioned by the use of that force is inherently a fact-specific inquiry, not susceptible to bright lines. But it is clearly established that the government must have some interest in using deadly force over other kinds of force.
Here, then, the clearly established legal question-the question a reasonable officer would have asked-is whether, under all the circumstances as known to Mullenix, there was a governmental interest in shooting at the car rather than waiting for it to run over spike strips.
The majority does not point to any such interest here. It claims that Mullenix's goal was not merely to stop the car, but to stop the car "in a manner that avoided the risks" of relying on spike strips. Ante, at 311. But there is no evidence in the record that shooting at Leija's engine block would stop the car in such a manner.
The majority first suggests that Mullenix did not wait for the results of the spikes, as his superior advised, because of his concern for the officers manning the strips. But Leija was going to come upon those officers whether or not Mullenix's shooting tactic was successful: Mullenix took his shot when Leija was between 25 and 30 yards away from the spike strip, traveling at 85 miles per hour. Even if his shots hit Leija's engine block, the car would not have stopped instantly. Mullenix would have bought the officers he was trying to protect-officers who had been trained to take defensive positions-less than three-quarters of a second over waiting for the spike strips. And whatever threat Leija posed after his car was stopped existed whether the car was stopped by a shot to the engine block or by the spike strips.
Nor was there any evidence that shooting at the car was more reliable than the spike strips. The majority notes that spike strips are fallible. Ante, at 310 - 311. But Mullenix had no information to suggest that shooting to disable a car had a higher success rate, much less that doing so with no training and at night was more *315 likely to succeed. Moreover, not only did officers have training in setting up the spike strips, but they had also placed two backup strips further north along the highway in case the first set failed. A reasonable officer could not have thought that shooting would stop the car with less danger or greater certainty than waiting.
The majority cites Long v. Slaton, 508 F.3d 576 (C.A.11 2007), for the proposition that Mullenix need not have "first tried less lethal methods, such as spike strips." Ante, at 311. But in that case, there was a clear reason to prefer deadly force over the alternatives. In Long, an officer fired to stop a suspect from fleeing in a stolen police cruiser. 508 F.3d, at 583. When the officer fired, there were no alternative means of stopping the car in place. The Eleventh Circuit held that the governmental interest against waiting for a future deployment of spike strips that may never materialize justified the use of deadly force. Ibid.
In this case, by contrast, neither petitioner nor the majority can point to any possible marginal gain in shooting at the car over using the spike strips already in place. It is clearly established that there must be some governmental interest that necessitates deadly force, even if it is not always clearly established what level of governmental interest is sufficient.
Under the circumstances known to him at the time, Mullenix puts forth no plausible reason to choose shooting at Leija's engine block over waiting for the results of the spike strips. I would thus hold that Mullenix violated Leija's clearly established right to be free of intrusion absent some governmental interest.
III
The majority largely evades this key legal question by focusing primarily on the governmental interest in whether the car should be stopped rather than the dispositive question of how the car should be stopped. But even assuming that Leija posed a "sufficient," ante, at 310, or "immediate," ante, at 309 - 310, threat, Mullenix did not face a "choice between two evils" of shooting at a suspect's car or letting him go. Scott, 550 U.S., at 384, 127 S.Ct. 1769 ; see, e.g., Plumhoff v. Rickard, 572 U.S. ----, ----, 134 S.Ct. 2012, 2017-2018, 2021-2022, 188 L.Ed.2d 1056 (2014) ; Brosseau v. Haugen, 543 U.S. 194, 196-197, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). Instead, Mullenix chose to employ a potentially lethal tactic (shooting at Leija's engine block) in addition to a tactic specifically designed to accomplish the same result (spike strips).* By granting Mullenix qualified immunity, this Court goes a step further than our previous cases and does so without full briefing or argument.
Thus framed, it is apparent that the majority's exhortation that the right at stake not be defined at "a high level of generality," see ante, at 308, is a red herring. The majority adduces various facts that the Fifth Circuit supposedly ignored in its qualified immunity analysis, including that Leija was "a reportedly intoxicated fugitive, set on avoiding capture *316 through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road." Ante, at 309. But not one of those facts goes to the governmental interest in shooting over awaiting the spike strips. The majority also claims that established law does not make clear that "Mullenix's reasons were insufficient to justify" his choice of shooting over following his superior's orders to wait for the spikes. Ante, at 310 - 311. But Mullenix seemed to have no reasons to prefer shooting to following orders.
Instead of dealing with the question whether Mullenix could constitutionally fire on Leija's car rather than waiting for the spike strips, the majority dwells on the imminence of the threat posed by Leija. The majority recharacterizes Mullenix's decision to shoot at Leija's engine block as a split-second, heat-of-the-moment choice, made when the suspect was "moments away." Ante, at 309. Indeed, reading the majority opinion, one would scarcely believe that Mullenix arrived at the overpass several minutes before he took his shot, or that the rural road where the car chase occurred had few cars and no bystanders or businesses. 773 F.3d, at 717, 720. The majority also glosses over the facts that Mullenix had time to ask Byrd for permission to fire upon Leija and that Byrd-Mullenix's superior officer-told Mullenix to "stand by." Id., at 717. There was no reason to believe that Byrd did not have all the same information Mullenix did, including the knowledge that an officer was stationed beneath the overpass. Even after receiving Byrd's response, Mullenix spent minutes in shooting position discussing his next step with a fellow officer, minutes during which he received no information that would have made his plan more suitable or his superior's orders less so. Ibid.
An appropriate reading of the record on summary judgment would thus render Mullenix's choice even more unreasonable. And asking the appropriate legal question would leave the majority with no choice but to conclude that Mullenix ignored the longstanding and well-settled Fourth Amendment rule that there must be a governmental interest not just in seizing a suspect, but in the level of force used to effectuate that seizure.
* * *
When Mullenix confronted his superior officer after the shooting, his first words were, "How's that for proactive?" Ibid. (Mullenix was apparently referencing an earlier counseling session in which Byrd suggested that he was not enterprising enough. Ibid. ) The glib comment does not impact our legal analysis; an officer's actual intentions are irrelevant to the Fourth Amendment's "objectively reasonable" inquiry. See Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). But the comment seems to me revealing of the culture this Court's decision supports when it calls it reasonable-or even reasonably reasonable-to use deadly force for no discernible gain and over a supervisor's express order to "stand by." By sanctioning a "shoot first, think later" approach to policing, the Court renders the protections of the Fourth Amendment hollow.
For the reasons discussed, I would deny Mullenix's petition for a writ of certiorari. I thus respectfully dissent.

The majority describes the choice between spike strips and shooting as the choice between "one dangerous alternative" and another, noting that spike strips can pose a danger to drivers that encounter them. Ante, at 310 - 311. But Mullenix could not have thought that awaiting the spikes was anywhere near as dangerous as shooting immediately before Leija hit the spikes. For one thing, Mullenix had no training in shooting to disable the vehicle and so no idea of the relative danger that shooting posed to a driver. For another, Leija would be subjected to the danger posed by the spike strips whether Mullenix shot or not. And, in fact, that is what happened: Leija's car hit the spike strips and then rolled two and a half times.