KELLY, Circuit Judge, dissenting.
 

 "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' "
 
 Tolan v. Cotton
 
 ,
 
 572 U.S. 650
 
 , 656,
 
 134 S.Ct. 1861
 
 ,
 
 188 L.Ed.2d 895
 
 (2014) (per curiam) (quoting
 
 Anderson
 
 ,
 
 477 U.S. at 249
 
 ,
 
 106 S.Ct. 2505
 
 ). And it is "axiom[atic] that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' "
 
 Id.
 
 at 651,
 
 134 S.Ct. 1861
 
 (second alteration in original) (quoting
 
 Anderson
 
 ,
 
 477 U.S. at 255
 
 ,
 
 106 S.Ct. 2505
 
 ). Our task at summary judgment is particularly delicate where, as here, the record is fact-intensive
 and much of the evidence is circumstantial. After all, we have explained that "[a] given piece of circumstantial evidence may equally support many inferences," and it is a "fallacy" to "assum[e] that only inferences that are more probable than other inferences may be drawn from [such] evidence."
 
 Grinder v. S. Farm Bureau Cas. Ins. Co.
 
 ,
 
 590 F.2d 741
 
 , 744 (8th Cir. 1979). The "drawing of legitimate inferences"-that is, deciding
 
 which
 
 of the permissible inferences ultimately to draw-is a function for the jury.
 
 Anderson
 
 ,
 
 477 U.S. at 255
 
 ,
 
 106 S.Ct. 2505
 
 . Our task here is simply to assess "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."
 

 Id.
 

 at 251-52
 
 ,
 
 106 S.Ct. 2505
 
 . In my view, the evidence here is not "so one-sided," and I would reverse the judgment of the district court and allow the Receiver's claims to proceed to trial.
 

 When properly viewed in the light most favorable to the Receiver, the record reveals a genuine dispute of material fact as to both (1) whether Sarles actually "kn[ew] that the primary tortfeasor[s'] conduct constitute[d] a breach of duty;"
 
 [4]
 
 and (2) whether he "substantially assist[ed] or encourage[d] the primary tortfeasor[s] in the achievement of the breach."
 
 Zayed I
 
 ,
 
 779 F.3d at 733
 
 (quoting
 
 Witzman
 
 ,
 
 601 N.W.2d at
 
 187 ). As the court notes, we evaluate these elements in tandem,
 
 Witzman
 
 ,
 
 601 N.W.2d at 188
 
 , and both can be proved by circumstantial evidence,
 
 K & S P'ship v. Cont'l Bank, N.A.
 
 ,
 
 952 F.2d 971
 
 , 977 (8th Cir. 1991) ;
 
 Ariola v. City of Stillwater
 
 ,
 
 889 N.W.2d 340
 
 , 356-57 (Minn. Ct. App. 2017),
 
 review denied
 
 (Apr. 18, 2017). "[W]here there is a minimal showing of substantial assistance, a greater showing of scienter is required."
 
 Camp v. Dema
 
 ,
 
 948 F.2d 455
 
 , 459 (8th Cir. 1991) (quoting
 
 Metge v. Baehler
 
 ,
 
 762 F.2d 621
 
 , 624 (8th Cir. 1985) ). "Factors such as the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind all come into play."
 
 Witzman
 
 ,
 
 601 N.W.2d at 188
 
 .
 

 I.
 

 Here, the Receiver has "present[ed] evidence from which a jury might" conclude that Sarles knew that the principals were committing the torts of conversion, breach of fiduciary duty, fraud, and false representations, and that he substantially assisted them in committing those torts.
 
 Anderson
 
 ,
 
 477 U.S. at 257
 
 ,
 
 106 S.Ct. 2505
 
 . Viewed in the light most favorable to the Receiver, the record demonstrates that Sarles was intimately aware of the principals' business (which was a fraud); took action to assist them in furthering their tortious conduct; and was unusually close with the principals, and with Cook in particular.
 

 For instance, a jury could reasonably conclude that Sarles knew of the tortious conduct based in part on his attendance at several key meetings in 2008. Pettengill testified that around April 2008, he saw Sarles at an investment seminar, which Sarles attended to "see what [the principals] did." As we have previously described, the principals would pitch a "risk-free," "completely safe" investment
 scheme that duped investors into believing that "they would be investing in foreign currency trading, which was guaranteed and had a fixed rate every month."
 
 Beckman
 
 ,
 
 787 F.3d at 475
 
 (cleaned up). Sarles was an experienced banker who had received bank secrecy and anti-money laundering training. At the very least, a jury could reasonably conclude that from this point on, Sarles began to gather sufficient information to know that the principals were dishonest and pitching a scam. The court, however, dismisses this evidence because Pettengill agreed that Sarles said nothing at the seminar to indicate he (Sarles) knew the pitch was fraudulent. But Pettengill said that his only interaction with Sarles at the seminar was to exchange a simple greeting, and that it was before the seminar even began.
 

 After the investment seminar, Sarles attended a critical meeting where, according to Pettengill, the principals made Sarles aware of two key facts: (1) that the Swiss Crown Forex S.A. account had a $2 million balance that they needed to make appear as a $15 million balance through a "repapering" effort involving wire transfers from the insolvent Swiss account to a U.S. account; and (2) that they needed a "friendly banker" to "make it look clean" and "get around Wells Fargo's questioning all the wire transfers" and that bank's growing suspicions. According to Pettengill, Sarles "agree[d] to the process," which was impliedly illegal, and said something along the lines of, "Yes, I can move the money in this way." Again according to Pettengill, Cook said that Sarles "[is] going to be our new banker. ... And he will do whatever we need to do to open accounts and do the wire transfer and do whatever we need[ ] to have done." Pettengill's impression was that Cook chose to work specifically with Sarles because Sarles "was our guy and ... would do whatever Cook wanted, even if it was legal or illegal."
 

 The timing of these events is important. It was after attending the seminar and the above-described meeting that Sarles helped the principals open several accounts that became central to the principals' torts. The first was the U.S. Crown Forex LLC account. Kiley and Smith were the only signatories on the account, but Sarles opened it at Cook's direction. Sarles knew that the account was supposed to hold investor funds, yet evidence in the record indicates that it was opened as a "Checking/Money Market" account. Moreover, although the account-opening form states that a "[r]eport from a state registration information website" had been received to verify LLC status, Sarles admitted that "when [he] opened the Crown Forex LLC account, [he] was not provided with Secretary of State registration documentation," in violation of Associated Bank's procedures. It is true, as the court notes, that Sarles testified that all he was doing by opening the account without proper documentation was providing "above and beyond customer service." But it is not up to us to definitively credit this testimony where there is conflicting evidence in the record.
 
 [5]
 
 Although Sarles
 claims he expected to receive the required documents at a later date, he never received them and he never followed up. After assessing the credibility of those involved, a jury could reasonably conclude that this evidence supports a finding that Sarles had knowledge of the principals' tortious conduct.
 
 See
 

 Anderson
 
 ,
 
 477 U.S. at 255
 
 ,
 
 106 S.Ct. 2505
 
 ("[C]redibility determinations ... and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ....").
 

 After opening the Crown Forex LLC account, Sarles opened four more accounts associated with the scheme. These accounts contained a variant of the name "Oxford,"
 
 [6]
 
 had the same address, and were opened within a three-month period. According to Sarles, Cook told him that one of these accounts, Oxford Global FX, on which Cook was the sole signatory, would not hold investor funds. Leo Domenichetti, a contractor hired to perform general maintenance on Cook's properties, was also a signatory on one of the Oxford Global accounts. This was so even though he had no substantive role in the principals' "business." According to Domenichetti, Sarles directed him to sign an account form that he had not read. Domenichetti also said that, when he signed it, portions of the form were covered up, and the other signatories' lines were blank. Domenichetti also testified that the "Administrative Assistant" title that was next to his name on the form-a title Domenichetti characterized as "baloney"-was added after he signed it.
 

 The circumstances surrounding the opening of the Oxford accounts are not insignificant.
 
 [7]
 
 A jury, of course, would be entitled to give this evidence little weight, or to decline to draw an inference of knowledge from these facts. But at this juncture, we can do neither.
 

 A reasonable jury could also consider the evidence that Sarles personally assisted Cook in improperly transferring millions of dollars from investor accounts to Cook's account. For instance, on April 30, 2009, Sarles approved Cook's request to transfer $1.7 million of investor funds from the Crown Forex LLC account (on which Cook was not a signatory) to Cook's Oxford Global FX account (on which he was the sole signatory).
 
 [8]
 
 Substantial record evidence, including from Associated Bank security employees, indicates that Sarles's approval of that transfer violated bank policy and industry standards. This improper transfer went undetected until Cook sought to withdraw $600,000 of that $1.7 million, in cash, to buy a yacht. At that point, the transfer caught the attention of other bankers. Associated Bank Senior Vice President Steven Bianchi halted the $600,000 withdrawal. He explained that Cook could not withdraw the money because the funds came from the $1.7 million
 that had been improperly transferred by Sarles. He explained:
 

 The [$1.7 million] should have been transferred by Crown Forex with an internal wire transfer instead of [the] internal bank transfer [approved by Sarles].
 
 Because ownership and signers are not the same or overlapping
 
 , the money should be deposited into Oxford Global via check or wire.
 
 The accounts are not related
 
 . Therefore, the transfer will be reversed (money taken out of Oxford Global and returned to Crown Forex) and Crown Forex will be instructed to transfer via internal wire transfer the $600,000 in question. After this internal wire has been verified, I will provide approval for this order to purchase cash.
 

 (emphasis added).
 

 Associated Bank ultimately permitted Cook to leave the bank with $600,000 of investor funds, but the process leading up to that withdrawal is relevant to the analysis. I respectfully disagree with the court's conclusion that this evidence suggests Sarles "contacted his supervisor" to ensure that "all procedures had been properly followed" before Cook could withdraw the $600,000. To the contrary, when viewed in the light most favorable to the Receiver, this evidence suggests that Sarles directly assisted Cook-in violation of bank policy and industry standards-in withdrawing investor funds for Cook's own use. Moreover, this improper transfer (and withdrawal) is not an outlier. Record evidence shows Sarles approved additional transfers of $1 and $2 million of investor funds from the Crown Forex LLC account to Cook's own Oxford Global FX account. The jury-not judges-must evaluate and weigh this evidence.
 

 In determining whether there is sufficient evidence of knowledge, both the relationship between Sarles and the "primary tortfeasor[s]" and Sarles's "state of mind ... come into play."
 
 Witzman
 
 ,
 
 601 N.W.2d at 188
 
 . Repeatedly, Pettengill indicated that the principals created an environment where the "operation" was seen as a " 'game' to get people's money." Pettengill "knew that things weren't right from the beginning," even if he did not know the precise "details" and "extent" of the fraud until later. According to Pettengill, Sarles too was immersed in this environment. Pettengill stated that he saw Sarles at the Van Dusen mansion "perhaps a dozen times," and with Cook "around six times discussing business and drinking."
 
 [9]
 
 As to these interactions, Pettengill said, "[m]any times we would just hang out in Cook's office and we ... would just be drinking and [Cook] would spout off on, you know, 'Greed is good' " and quote movie lines about greed and money. The point of this evidence is not whether Sarles knew about the tortious conduct simply because he heard the principals recite movie lines. The point is whether a jury could reasonably infer that Sarles knew of the tortious conduct based, at least in part, on his active participation in an atmosphere where greed was openly glorified and getting people's money was viewed as a game-a 193-million-dollar game that cost some victims their entire life savings.
 
 See
 

 Beckman
 
 ,
 
 787 F.3d at 474
 
 .
 

 To be sure, each individual piece of evidence described above, standing alone, may not be sufficient to indicate Sarles knew of every detail of the Ponzi scheme and its full extent. But the case before us is for aiding and abetting the
 
 specific
 
 torts
 of breach of fiduciary duty, conversion, false representation, and fraud. Associated Bank, in fact, concedes that these specific torts were "committed by the operators of a Ponzi scheme who stole investors' money from 2006 until 2009." When viewed as a whole,
 
 see
 

 Reeves
 
 , 530 U.S. at 151,
 
 120 S.Ct. 2097
 
 , the evidence could lead a reasonable jury to conclude that Sarles knew that the principals' conduct constituted each of the alleged torts.
 
 [10]
 
 A jury could conclude that Sarles knew of the principals' breach of fiduciary duty because, among other things, he helped Cook withdraw hundreds of thousands of dollars of investor funds for use inconsistent with the funds' intended purpose and helped the principals implement an illegal scheme designed to mask a $13 million shortfall of investor funds. Cf.
 
 Reisdorf v. i3, LLC
 
 ,
 
 129 F.Supp.3d 751
 
 , 767 (D. Minn. 2015) (Under Minnesota law, "[f]iduciary duty requires officers and directors 'to act in good faith, with honesty in fact, with loyalty, in the best interests of the [beneficiary].' ");
 
 Vacinek v. First Nat'l Bank of Pine City
 
 ,
 
 416 N.W.2d 795
 
 , 799 (Minn. Ct. App. 1987) (explaining that fiduciary relationships are characterized by two attributes: "superiority of knowledge of one party and confidence reposed by the other").
 

 A jury could also conclude that Sarles had knowledge of the tort of conversion based on this same evidence, that is, that he personally assisted the principals in transferring (and withdrawing) at least $600,000 of investor funds for Cook's own use.
 
 See
 

 Rudnitski v. Seely
 
 ,
 
 452 N.W.2d 664
 
 , 668 (Minn. 1990) ("Conversion is the exercise of dominion and control over goods inconsistent with, and in repudiation of, the owner's rights in those goods."). Similarly, a jury could find that Sarles had knowledge of the tort of false representations because he knew what the principals promised investors, but also knew that investor funds were being misused.
 
 See
 

 Specialized Tours, Inc. v. Hagen
 
 ,
 
 392 N.W.2d 520
 
 , 532 (Minn. 1986) (listing the elements of an affirmative misrepresentation claim in Minnesota as requiring that: "(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation ... ; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance").
 

 Sarles's knowledge of the fraud claim presents a closer call. The Receiver's complaint alleges the fraud claim specifically as a "Ponzi scheme"-a type of fraud in which "the operator promises investors returns on their investment which the operator intends to pay from funds provided by new investors, rather than from profits generated by the underlying business venture."
 
 In re Armstrong
 
 ,
 
 285 F.3d 1092
 
 , 1093 n.3 (8th Cir. 2002). In my view, however, Sarles's willingness to help the principals open accounts to make a $2 million balance appear as a $15 million balance coupled with the other evidence of banking improprieties prevents us from concluding, as a matter of law, that he had no knowledge of the Ponzi scheme.
 

 As the court notes, the evidence in this case is largely circumstantial. But refusing to submit to a jury circumstantial evidence of the type found here comes far too close to impermissibly requiring
 
 direct
 
 evidence
 of actual knowledge even where circumstantial evidence in fact can and may suffice.
 
 See
 

 United States v. Hirani
 
 ,
 
 824 F.3d 741
 
 , 747 (8th Cir. 2016) ("In both civil and criminal cases, circumstantial evidence is considered just as probative as direct evidence ...."). Moreover, as we have often explained, fact-intensive inquiries, in particular those containing a knowledge component, "[are] generally inappropriate for summary judgment."
 
 Best Buy Stores, L.P. v. Benderson-Wainberg Assocs., L.P.
 
 ,
 
 668 F.3d 1019
 
 , 1030 (8th Cir. 2012) (reversing grant of summary judgment on affirmative defenses containing knowledge as an element). "[A] non-moving party survives summary judgment when the facts, while thin, enable a jury to draw a reasonable inference for its claim."
 
 Hill v. Sw. Energy Co.
 
 ,
 
 858 F.3d 481
 
 , 487 (8th Cir. 2017) (cleaned up).
 

 II.
 

 The above-described circumstantial evidence could also lead a jury reasonably to conclude that Sarles substantially assisted the principals' torts. To qualify under Minnesota law, "[a]ssitance must further the [tort] itself, and not merely constitute general aid to the tortfeasor."
 
 Zayed I
 
 ,
 
 779 F.3d at 735
 
 (cleaned up). " '[S]ubstantial assistance' means something more than the provision of routine professional services."
 
 Witzman
 
 ,
 
 601 N.W.2d at 189
 
 . Viewing the evidence in the light most favorable to the Receiver, a jury could reasonably conclude that Sarles did more than provide the principals with ordinary banking services. He opened accounts-without the proper documentation-to assist them in an illegal "repapering" effort after Wells Fargo had grown suspicious of the principals' banking activity. He helped Cook transfer and withdraw large sums of investor funds for his own use and in violation of Associated Bank's policies and industry standards.
 
 Cf
 

 id.
 

 (holding that the plaintiff failed to state a claim when "[t]he only 'assistance' " she alleged was "performance of routine accounting duties-i.e., preparing financial statements," etc.). Assessed in tandem with the evidence of Sarles's knowledge of the principals' "business model" promising risk-free and guaranteed returns, and viewed in the light most favorable to the Receiver, this evidence suggests that Sarles was far more than a mere bystander.
 
 Cf
 

 id.
 

 ("The mere presence of the particular defendant at the commission of the wrong, or his failure to object to it, is not enough to charge him with responsibility." (cleaned up) ).
 

 In sum, I believe the Receiver has presented sufficient evidence to defeat summary judgment. Accordingly, I respectfully dissent.
 

 Were it necessary to reach the issue, I would be inclined to agree with the court that Minnesota does not recognize a "constructive knowledge" standard. But it is unnecessary to resolve that issue now because there is substantial circumstantial evidence from which a jury could reasonably conclude that Sarles had
 
 actual
 
 knowledge of the principals' tortious conduct.
 

 There is plenty of evidence impeaching Sarles's credibility, including his conflicting testimony about the nature of his social interactions with the principals.
 
 See
 

 Reeves v. Sanderson Plumbing Prods., Inc.
 
 ,
 
 530 U.S. 133
 
 , 151,
 
 120 S.Ct. 2097
 
 ,
 
 147 L.Ed.2d 105
 
 (2000) (noting that at summary judgment, courts "must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses' " (citation omitted) (quoting 9A Charles Alan Wright & Arthur R. Miller,
 
 Federal Practice and Procedure
 
 § 2529 (2d ed.1995) ) ). Moreover, at least two witnesses suggested that Sarles asked them to sign blank bank forms-or, in other words, that he opened accounts without required documentation.
 

 For example, Oxford Global Investments Inc., Oxford Global Partners LLC, and Oxford Global FX, LLC.
 

 In fact, David Martens, who was employed in bank security at Associated Bank while the fraud unfolded, testified that the opening, within a short time period, of multiple bank accounts with similar names listing the same address might evince fraud. Although he characterized Sarles's conduct as nothing but "sloppy banking," the drawing of ultimate conclusions from Martens's testimony is a function for the jury.
 

 Smith initiated the request, but the record shows Cook directed her to do so.
 

 Sarles himself testified that he spoke to Cook on the phone at a "minimum" once a week, and often more frequently than that.
 

 Regrettably, the Receiver fails to engage in the required tort-by-tort analysis in its brief, even though he argues that the district court erred in failing to analyze the claims individually. The fact that Associated Bank concedes the principals committed the torts, but neither party elaborates on this point, further complicates our task at summary judgment.