*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TRINITY HENDERSON,

        Plaintiff-Appellee,

v

CITY OF MELVINDALE and MELVINDALE
CHIEF OF POLICE,

        Defendant-Appellants,

and

MATHEW FURMAN,

        Defendant.

UNPUBLISHED
November 21, 2019

No. 342679
Wayne Circuit Court
LC No. 16-014944-CZ

Before: RONAYNE KRAUSE, P.J., and METER and STEPHENS, JJ.

PER CURIAM.

STEPHENS, J. (*dissenting*).

I write to dissent from the majority's conclusion that the trial court erred in its denial of summary disposition. After a review of the record evidence in this case, I agree with the trial court that there is a material question of fact as to whether the force used by defendant Mathew Furman was unreasonable or excessive.

I begin with a reiteration of the majority's recitation of the *Maiden v Rozwood* standard of review. That standard requires that a reviewing court accept the well-pled allegations in the complaint unless they are contradicted by admissible evidence. 461 Mich 109, 119; 597 NW2d 817 (1999). In a case that also involved a claim of excessive force, the United States Supreme Court underscored the reasons that summary judgment is inappropriate where witnesses to an event provide starkly different descriptions of what they saw, heard, or perceived. *Tolan v Cotton*, 572 US 650; 134 S Ct 1861; 188 L Ed 2d 895 (2014), arose from a police shooting at the home of a man suspected of having stolen a car. The legal issue presented was whether the

-1-

officer was entitled to qualified immunity, which immunizes an officer from liability when the use of force is reasonable. *Id*. at 651.

The trial court granted summary relief to the defendant and the circuit court affirmed. The Supreme Court reversed, highlighting that at the summary judgment stage, courts must not sort through the evidence to find truth; that job is reserved for the jury. In language pertinent to this case, the Supreme Court emphasized the importance of viewing the evidence in the light most favorable to the nonmoving party:

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [the plaintiff's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party. [*Id*. at 660.]

I submit, that when the majority noted that the gravamen of this case was to "characterize" the evidence in the DVD of the dash-cam recording of events, it replicated the error made in *Tolan* and failed to view the evidence in the light most favorable to the nonmovant.

Appellate review is limited by the record that was presented to the trial court when the challenged decision was made. *Amorello v Monsanto Corp*, 186 Mich App 324, 330; 463 NW2d 487 (1990). It is essential, therefore to outline the materials presented to the trial court in this case. Furman appended the following to his motion and supporting brief:

1. Pages 54-61 of defendant Matthew Furman's April 21, 2017 deposition.

2. The entirety of plaintiff Trinity Henderson's deposition.

3. The complaint.

4. A DVD of the dash-cam recording from the police vehicle driven by the defendant on the day of the incident.

No other documents were offered at oral argument. While the court had access to the court file, neither the court nor the parties addressed other substantive evidence contained within that file during oral argument, or during the court's oral ruling.

Although Henderson testified that the basis for the traffic stop that gave rise to this case was pre-textual and a result of what she described as "profiling," she does not contest that there were several legal bases for the effectuation of an arrest. I note that the majority offers a reason for the stop that the defendants did not assert through counsel at trial, on appeal, or in the six pages of the deposition presented to the trial court. Since Henderson agrees that the arrest itself was legal, the initial reasons for the traffic stop have marginal relevance to a review of the ruling on summary disposition.

There were four instances of alleged wrongful conduct asserted against Furman:

1. Physically removing the plaintiff from her vehicle.

2. Causing the plaintiff's head to come into contact with the hood of the police car.

3. Forcing the plaintiff to the ground.

4. Discharges of the taser.

These claims were made in paragraphs 19-21 of the complaint. Henderson testified in support of those assertions in her deposition taken on May 24, 2017. Describing the point at which she was tased, her testimony was:

> When I got down on the ground, he still was attacking me for some odd reason. Um, I saw him pull out his taser. I did not feel the first tase because my adrenaline was going and he end up winding it up - I don't know how the tasers work- and he started stinging me wit [sic] it. So once he saw me - the second time I felt it and he said let me see your hands but my hands was always in front of me. So he kept tasing me, kept tasing me and he told me drop the phone. And I said the phone is dropped, I dropped the phone. And he kept tasing me, still, and he lift up my shirt and he tased me one last time.

The defendants' answers to the complaint denied the allegations. The six pages of Furman's deposition that were offered to the trial court discussed the events that occurred after Henderson came to be on the hood of the police vehicle. He testified that from that time forward, Henderson resisted his lawful commands and that he discharged the taser on the stun setting four times, all in response to her resistance. Furman testified, "[n]o, she was kicking me and still fighting, wouldn't let me see her hands, arms, things like that." Later in his deposition, he testified that only three of the four taser discharges made contact with Henderson's body. He also unequivocally averred that he did not discharge again after she was handcuffed. The contradictory testimonial evidence from the parties' depositions establishes several material questions of fact regarding Furman's use of force.

The DVD of the dash-cam video does not resolve those questions of material fact. The recording began as defendant Furman traversed the city in his patrol car. Henderson's vehicle first came into camera view as it traveled in the opposite direction of the police car in the curb lane. Another vehicle traveled alongside Henderson's car, both older model cars with headlights on. The police car was in the left lane and made a U-turn. Furman drove his vehicle into the curb lane behind Henderson's vehicle. Within minutes, Henderson's vehicle turned right into a parking lot and stopped. The majority properly characterizes Henderson's behavior as uncooperative. She gave false information regarding the vehicle's ownership and registration. She claimed surprise that her driver's license was suspended. Both the car registration tabs and license plate were invalid, and the vehicle was uninsured. Furman advised Henderson that she was going to be arrested and afforded her the opportunity to contact someone to secure her infant. She called someone and gave her description of her circumstances that included "kick his ass." Furman also communicated with someone, and relayed what he described as a threat from Henderson to assault him. At that point, Furman had the keys to Henderson's vehicle and the

driver's side window in that car was rolled down. Henderson was ordered to exit the vehicle. She did not do so and continued to talk to someone on her mobile device. In her deposition, she acknowledged that she reached into the back of the vehicle to cover her child. There is, however, no testimony that Furman was threatened by Henderson's reaching into the backseat. As Furman continued to order Henderson out of the car, she asked to roll up the windows. Furman denied that request and reached into the car to extract Henderson from it. Once pulled from the vehicle, Henderson's body made contact with the car hood while she continued speaking into and holding onto her cell phone. Henderson grabbed the ram-bar at the front of the police car. The next command given by Furman was, "let go of the car." Furman held onto Henderson by her hair and her head made repeated contact with the police car hood. Henderson released the ram-bar and she was propelled to the ground. From that point forward, Henderson's body was not visible to the camera. However, her voice was recorded. Portions of Furman's lower body were also not fully visible at that point and he made a few downward movements. Henderson was recorded alternatively addressing someone on the phone and Furman. Within moments, Furman gave a warning regarding a taser, and then discharged it four times. Henderson emitted sounds consistent with a pain response. The remaining minutes of the DVD were not relevant for the analysis of the motion.

Summary disposition must be granted with restraint. "If reasonable jurors could honestly have reached different conclusions, this Court may not substitute its judgment for that of the jury." *Wiley v. Henry Ford Cottage Hosp*, 257 Mich App 488, 491; 668 NW2d 402 (2003). A court must review the record evidence, make all reasonable inferences therefrom, and determine whether a genuine issue of material fact exists, giving the nonmoving party the benefit of reasonable doubt. *Skinner v. Square D Co*, 445 Mich 153, 161–162; 516 NW2d 475 (1994). On review, an appellate court must also make all reasonable inferences in the nonmoving party's favor. *Id*. at 162, citing *Moll v Abbott Laboratories*, 444 Mich 1, 27, n 36; 506 NW2d 816 (1993).

Unlike the majority, I do not find that the DVD is clear or unequivocal. Most illustrative of the DVD's failure to resolve conflicts between the testimonies of the parties arises at the point in the DVD where neither Henderson nor Furman were within full view of the dash-cam. Like *Tolan*, this case involves contradictory eyewitness testimony. Unlike *Tolan*, the record also includes video evidence, but as the majority admits, the video does not capture much of the struggle between Furman and Henderson. Despite that concession, however, the majority disregards Henderson's testimony describing that struggle, and instead accepts Furman's. This is error. When considering facts in the light most favorable to the nonmoving party, a court must adopt the nonmovant's view of the facts unless they are blatantly contradicted by other evidence. Henderson testified that she complied with Furman's instruction and had her hands fully visible but was nonetheless subjected to the discharge of the taser. Furman's unequivocal testimony is that Henderson was not compliant until she was handcuffed. Here, no evidence contradicts Henderson's description of what happened outside the camera's view. At a trial on the merits, these contradictory versions of events would be resolved by triers of fact to whom the task of resolving credibility is given. If the jury believes that Henderson was compliant with Furman's commands as conveyed to her while she was on the ground, they would likely find that the discharge of the taser was unreasonable and excessive force. There were other conflicts between the portion of Furman's testimony presented to the trial court and Henderson's deposition. The participants in the affray gave conflicting testimony at least on the following issues:

1.  The intensity of the taser discharges (stun or full blast);

2.  The number and timing of the discharges that made contact with Henderson's body (3 or 4); and

3.  Whether any discharge was made into flesh that was intentionally exposed.

The timing, intensity, and number of discharges are relevant to whether Furman's actions were the result of a good faith belief that his exercises of force were reasonable or the result of malice, or the product of a reckless disregard for whether injury would occur. I cannot determine from the DVD or the testimony what a reasonable amount of force was prior to the discharge of the taser. By way of example, my review of the DVD at the point at which Henderson was propelled toward the hood does not definitively resolve the question of whether she was resisting or attempting to regain her balance. I do not know from the testimony presented or the video if either Furman or Henderson equated "Let go of the car" as a command to right oneself and present hands for handcuffing that was willfully disobeyed.

Reasonable force is "the measure of necessary force . . . which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary." *Barrett v United States*, 62 US App DC 25, 26; 64 F2d 148 (1933). Henderson's version of the facts in this case was fully presented to the trial court through her deposition. The trial court and this panel were given only a few pages from Furman's deposition. Those excerpts did not discuss events prior to the discharge of the taser and thus failed to convey Furman's knowledge and understanding of the circumstances in this case. This case should be entrusted to the fully informed wisdom of a jury.

For these reasons, I dissent and would affirm the trial court's denial of summary disposition.


/s/ Cynthia Diane Stephens