**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3608
_____

ROBERT GARDNER,
                                        Appellant

v.

SEPTA

_____

On Appeal from the United States District Court for the
Eastern District of Pennsylvania
(District Court No.:  2:17-cv-04476)
District Judge:  Honorable Chad F. Kenney

_____

Submitted under Third Circuit L.A.R. 34.1(a)
July 2, 2020
(Filed:  August 18, 2020)

Before:  GREENAWAY, JR., SHWARTZ and RENDELL, *Circuit Judges*.

_____

O P I N I O N*

_____

**RENDELL**, *Circuit Judge*.

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

Appellant Robert Gardner challenges two orders of the District Court, one granting a partial motion to dismiss certain of his ADA claims and another granting summary judgment for Appellee Southeastern Pennsylvania Transportation Authority (SEPTA) on other claims. For the following reasons, we will affirm.

## I. BACKGROUND

This case arises out of Gardner's attempt to obtain disability accommodations from his employer, SEPTA. Gardner began working for SEPTA in January 2014 as a bus operator. On March 12, 2014, Gardner applied to transfer from his position as a bus operator to a position operating a rail trolley. According to a collective bargaining agreement (CBA) between the Transport Workers Union Local 234 City Transit Division (Local 234) and SEPTA, SEPTA was obligated to consider transfer requests like Gardner's based on seniority. As a bus operator, Gardner was a member of Local 234 and covered by the CBA.

In August 2014, Gardner experienced a non-work-related motor vehicle accident. As a result, he sought medical treatment, including neck and back surgery. On June 4, 2015, while operating a SEPTA bus, Gardner was involved in a work-related accident. Gardner claims that this accident exacerbated his existing injuries.

Gardner reported to SEPTA that he suffered work-related injuries from the accident and made a workers' compensation claim for related medical treatment. On July 28, Dr. Lawrence Axelrod, SEPTA's workers' compensation physician, evaluated Gardner. Dr. Axelrod determined that Gardner could return to work with restrictions and,

at Gardner's request, specified that Gardner could operate rail vehicles but not buses.[1] Based on Dr. Axelrod's report, on July 31, 2015, SEPTA assigned Gardner to a temporary, light-duty position.

On August 5, 2015, Gardner's personal physician, Dr. Mark Allen, prepared a document that stated Gardner was "capable of driving a trolley car only." App. 441. When Gardner again met with Dr. Axelrod on August 11, 2015, Axelrod reported that Gardner gave him the August 5 form signed by Allen, and asked Axelrod to identically reproduce the restrictions Allen had identified.

On September 2, 2015, Gardner submitted a request for accommodation under the ADA. He claimed that, due to the injuries he sustained in the June 4 bus accident, which caused limitations on his ability to perform arm and hand motions, he was disabled and required accommodation. He specifically sought transfer to a trolley operator position, which he believed would cause less physical stress. In support of the request, Gardner submitted a "Physical Capacities Form," App. 440, from Dr. Allen noting arm and hand limitations and the document indicating that he was "capable of driving a trolley car only," App. 441. At that time, Gardner was number 35 of 37 on the seniority list for transfers to trolley operator positions.

---

[1] Dr. Axelrod observed in his notes that, given Gardner's prior request for a transfer to operating rail vehicles, Axelrod "felt compelled to consider the possibility that Mr. Gardner was displaying intentional manipulative type behaviors." App. 422. In a subsequent visit on August 11, Axelrod specifically informed Gardner that he "could not discern any significant difference in the physical capabilities" for operating rail vehicles versus buses, but Gardner "repeated his requests/demands that [Axelrod] disqualify him specifically from driving a bus and to allow him to operate . . . rail vehicles." *Id.*

3

On September 4, 2015, Jacqueline Hopkins, an ADA compliance consultant in SEPTA's Equal Employment Opportunity (EEO) department, spoke with Gardner by phone about his request. Gardner followed up with an email, in which he reiterated his desire to be transferred to a trolley operator position and asked SEPTA to make an exception to the seniority requirements, which he believed SEPTA had done in the past. Hopkins responded that the transfer process is governed by the CBA and separate from the process of identifying an appropriate accommodation.

On September 17, Gardner submitted a note from Dr. Allen dated September 16. The note stated that "Mr. Gardner is cleared to return to full duties a[t] work." App. 492. On September 24, Hopkins wrote to Gardner, seeking clarification about the differing opinions from Dr. Allen. In response, Gardner submitted two Physical Capacities Forms from Dr. Allen and a Dr. Soto, both identifying the same restrictions noted in the documents attached to Gardner's original request. On September 30, Gardner submitted another report from Dr. Allen that said Gardner's condition was "[u]nchanged." App. 497–98. That report was dated September 16—the same date as the note that said Gardner could return to full duties.

On September 29 and 30, while SEPTA was considering the accommodation request, Gardner submitted Operator's Accident/Incident Reports, which asserted that he could not operate a bus safely because of his disabilities. In response to the Incident Reports, Gardner was put on sick leave on September 30 because his representations indicated that he was "not fit for duty" under the CBA. App. 504 (emphasis omitted).

4

The Assistant Director for SEPTA's Southern District told Gardner he could return if he provided the required medical clearance.

On October 1, 2015, Hopkins wrote to Gardner to acknowledge receipt of materials he sent on September 30 and to invite him to meet with her in person along with SEPTA Medical Director Dr. Jeffery Erinoff and Director of EEO/AA and Employee Relations Lorraine McKenzie. On the same day, Gardner filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations Commission (PHRC). SEPTA did not receive notice of that charge until November 16.[2] On October 5, Gardner filed a grievance against SEPTA through Local 234, protesting the failure to grant him the requested accommodation. In emails with SEPTA, however, it became clear that there were conflicting views within the union about circumventing the CBA to allow the requested transfer, with the President of Local 234 opposing such an action.

On October 7, Gardner met with Hopkins, Erinoff, and McKenzie. At that meeting, according to Gardner, Hopkins indicated that SEPTA would not be prepared to grant his request until he appeared for an independent medical evaluation (IME) scheduled by SEPTA's Workers' Compensation Department. On October 28, Hopkins

---

[2] In December 2015, the EEOC responded to Gardner's October 2015 charge, which had alleged discrimination and retaliation for seeking accommodation for his arm and hand disability. The letter requested any additional information to support the investigation and to rebut SEPTA's response to the initial charge. Gardner responded seeking a continued investigation and mentioned issues with post-traumatic stress disorder (PTSD) and related conduct by SEPTA employees. On August 15, 2017, the EEOC dismissed the charge.

5

wrote to Gardner, expressing SEPTA's intent to rely on the results of the IME in connection with his pending workers' compensation claim but noting that SEPTA would continue to explore reassignment options. The IME occurred on October 21, and the evaluating physician, Dr. Dennis McHugh, concluded "within a reasonable degree of medical certainty, that Mr. Gardner is fully recovered . . . and that he needs no further care. . . . Mr. Gardner could return to full duty work without restrictions as a SEPTA bus driver immediately." App. 556–57. On November 19, 2015, SEPTA's Vocational Consultant informed Gardner that, due to the IME results, he could return to work subject to a medical fitness-for-duty examination. On December 3, 2015, Hopkins notified Gardner that SEPTA was denying his request for accommodation.

On January 27, 2016, Gardner again submitted an ADA accommodation request, claiming the same limitations as in the September 2, 2015 request and seeking the same accommodation. He provided a November 2015 shoulder MRI result, a December 2015 cervical MRI result, two December 2015 reports from Dr. Allen, and a January 27, 2016 note from Dr. Allen, which stated, "Mr. Gardner is cleared to return to work operating trollies only. Not as a bus driver." App. 573. On February 10, 2016, SEPTA again received a note from Dr. Allen indicating that Gardner was "[c]leared to return to normal duties." App. 575. On February 22, 2016, Hopkins informed Gardner that his accommodation request was denied.

Appellant Gardner filed his Complaint against SEPTA in federal court on October 10, 2017, alleging claims of disability discrimination, disability harassment, and retaliation. His Complaint discussed the arm and hand impairment but also included

6

details about PTSD, depression, photophobia, and sensitivity to light. On March 29, 2018, SEPTA filed a Rule 12(b)(6) partial motion to dismiss the PTSD-related claims for failure to administratively exhaust them. On August 22, the District Court, Judge Goldberg, granted the motion.[3]

After answering the Complaint and conducting discovery, SEPTA filed a motion for summary judgment on August 16, 2019. The District Court—now Judge Kenney—granted the motion on October 17, finding that Gardner failed to make out a prima facie case of disability discrimination, that SEPTA satisfied its obligation to engage in an interactive process with Gardner, and that Gardner did not make out a prima facie case of retaliation. Gardner now appeals both the Court's decision to grant summary judgment for SEPTA and its earlier decision to grant the partial motion to dismiss.

## II.     JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We review *de novo* the District Court's decisions to grant the motion to dismiss and to grant summary judgment. *Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 708 (3d Cir. 2019); *DeHart v. Horn*, 390 F.3d 262, 272 (3d Cir. 2004).

## III.    DISCUSSION

Gardner challenges the District Court's decisions to grant the motion to dismiss with respect to his PTSD-related claims and to grant summary judgment on his disability

---

[3] On November 26, 2018, this case was reassigned from Judge Goldberg to Judge Kenney. *See* CM/ECF No. 25.

discrimination claims and his retaliation claim. For the following reasons, we will affirm both decisions.

### A.    Motion to Dismiss

Before filing a complaint for employment discrimination under the ADA, a plaintiff must exhaust administrative remedies by presenting the allegations in a timely administrative charge to the EEOC. *Churchill v. Star Enters.*, 183 F.3d 184, 190 (3d Cir. 1999). In determining whether the allegations in a complaint have been properly exhausted, courts consider "whether the acts alleged . . . are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984) (per curiam)). Where facts alleged in a complaint fall outside the core grievance addressed in the EEOC charge, the new claim is distinct and has not been administratively exhausted. *See id.* at 1295–96.

Here, the District Court correctly determined that Gardner's PTSD-related claims did not arise from the same core grievance discussed in the EEOC charge. Indeed, Gardner never mentioned the PTSD-related allegations in his initial charge, nor has he asserted that they are factually related to the incidents concerning his claimed arm and hand disabilities. In fact, the events underlying his PTSD-related allegations are entirely distinct from his other claims, as they arose at different times and involved different SEPTA employees. They were thus not within the scope of a reasonable investigation arising from the charge.

8

The District Court also rightly concluded that the brief mention of PTSD in Gardner's counsel's letter responding to the EEOC's request for more information was insufficient to compensate for the failure to make those allegations in the charge. An EEOC charge may only be amended to "cure technical defects or omissions . . . or to clarify and amplify allegations made therein." 29 C.F.R. § 1601.12(b). Any additional acts included by amendment must be "related to or growing out of the subject matter of the original charge." *Id.* Gardner's PTSD-related claims are not sufficiently related to his claims of arm and hand impairments to be considered an amendment to Gardner's original charge.

Because the PTSD-related claims did not arise out of the same grievance raised in the original charge and were not reasonably related to that charge, they were not properly exhausted. *See Hicks v. ABT Assocs. Inc.*, 572 F.2d 960, 967 (3d Cir. 1978). We therefore will affirm the District Court's decision to grant the partial motion to dismiss.

## B.    Motion for Summary Judgment

In evaluating SEPTA's motion for summary judgment, we must determine whether any genuine dispute of material fact exists, and if not, we must decide whether, viewing the evidence in the light most favorable to the plaintiff, SEPTA was entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

### a. Discrimination Claims

SEPTA argues that the District Court correctly granted summary judgment in its favor on the discrimination claims because Gardner failed to make out a prima facie case of discrimination under the ADA. To establish a prima facie case, Gardner was obligated to show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations . . . ; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citation omitted). The PHRA requires the same analysis.[4]

The District Court concluded that Gardner failed to meet even the first prong. Under the ADA, one has a disability if he has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A); *see* 29 C.F.R. § 1630.2(g)(1)(i). The District Court found that Gardner failed to establish a disability because he offered no "specific reference to a major life activity that [his] disability limits," and "the only activity [Gardner] claims is limited is his ability to work as a bus operator." App. 36. The District Court thus concluded that Gardner's claimed arm and hand problems did not substantially limit his ability to work. We are not so sure.

---

[4] The 2008 Amendments to the ADA clarified that whether an impairment is a disability "should not demand extensive analysis" and that "disability" "shall be construed broadly in favor of expansive coverage of" individuals. 28 C.F.R. § 36.101(b). The PHRA disability analysis, although otherwise parallel to the ADA analysis, does not demand such broad construction in favor of coverage. Because the District Court here found that Gardner failed to meet the ADA definition of disability, it found that he necessarily could not meet the narrower PHRA standard.

While one could conclude that Gardner's injuries did not constitute a substantial limitation, one might also conclude that they did, given the conflicting characterizations of Gardner's physical abilities by various medical professionals and the broad construction courts are obligated to give the term "disability." *See* 28 C.F.R. § 36.101(b). However, we need not resolve this issue because—even assuming Gardner was disabled within the meaning of the ADA—the District Court rightly determined that he has not shown he is a qualified individual under the second prong.

Under the ADA, a "qualified individual" is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position" sought. 42 U.S.C. § 12111(8); *see Taylor*, 184 F.3d at 306. Here, Gardner's requested accommodation of transfer to a trolley operator position was not a reasonable accommodation. At the time of his request, Gardner lacked the seniority for an internal transfer to a trolley operator role under the CBA, so his requested accommodation would have required that SEPTA violate the CBA. The ADA "does not require that collectively bargained seniority rights be compromised in order to reasonably accommodate a disabled individual." *Kralik v. Durbin*, 130 F.3d 76, 82 (3d Cir. 1997) (citation omitted). Accordingly, the seniority requirement applied and precluded Gardner from being eligible for the transfer he sought.

To bypass the seniority provision of the CBA, Gardner would have needed a waiver from the union. *See id.* at 83 ("[I]t is appropriate for the union, rather than the employer, to make the determination that the infringement is justifiable by releasing the employer from its obligation to follow the seniority provisions of the collective

11

bargaining agreement to accommodate a qualified individual with a disability."). The record indicates, however, that the Local 234 President opposed the transfer. Although Gardner points out that some members supported his transfer, such support does not amount to the union's formal waiver of the seniority requirement of the CBA. Thus, the seniority requirement continued to apply, and the requested accommodation was not reasonable. We therefore cannot find fault with the District Court's determination that Gardner was not a qualified individual under the ADA.

Relatedly, the District Court correctly determined that, even assuming Gardner was a qualified individual with a disability under the ADA, SEPTA fulfilled its obligation to engage in an "interactive process." *See* 29 C.F.R. § 1630.2(o); *Taylor*, 184 F.3d at 317. To prove otherwise, Gardner had to show that: (1) SEPTA knew he was disabled; (2) Gardner requested accommodations; (3) SEPTA made no "good faith effort to assist [Gardner] in seeking accommodations"; and (4) Gardner "could have been reasonably accommodated but for [SEPTA's] lack of good faith." *Taylor*, 184 F.3d at 319–20. Here, the record provides ample evidence of a good faith effort on SEPTA's part to assist Gardner. Hopkins discussed Gardner's request for a transfer with him by phone, by email, and in person. She explored the seniority issue, looking into how long Gardner would have to wait to be eligible for the position he sought and engaging with Local 234 to learn about the union's position on the requested transfer. When evaluating Gardner's request, SEPTA considered all of Gardner's documentation, seeking clarification when conflicting information arose. Even after deciding to rely on the IME, SEPTA continued to explore reassignment options to accommodate Gardner. We therefore agree with the

District Court that no reasonable juror could find that SEPTA failed to engage in the requisite interactive process.

For the foregoing reasons, we will affirm the District Court's decision to grant summary judgment for SEPTA on the disability discrimination claims.

### b. Retaliation

Gardner argues SEPTA retaliated against him for requesting accommodations by putting him on sick leave and refusing his second request for accommodation in January 2016. To establish a claim of retaliation, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

Here, Gardner failed to establish the third prong. Gardner's contention that there is a causal connection between his protected activity and SEPTA's allegedly adverse action is temporally implausible. As the District Court noted, "SEPTA placed [Gardner] on sick leave *before* [he] filed his administrative complaint." App. 58 (emphasis added).[5] Further, SEPTA was obligated under the CBA to put Gardner on sick leave due to his representations that his injuries prevented him from working, eliminating any suggestion that the action was prompted by Gardner's protected conduct. To the extent that

---

[5] This also precludes a finding that the placement of Gardner on sick leave constituted an adverse action in retaliation for his EEOC charge under the second prong. *Krouse*, 126 F.3d at 500.

13

Gardner's retaliation claim is based on SEPTA's denial of the requested transfer, we likewise agree with the District Court that the retaliation claim is simply an improper repackaging of Gardner's claim that SEPTA failed to accommodate him. Accordingly, we will affirm the District Court's decision to grant summary judgment for SEPTA on the retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, we will affirm the District Court's orders.